Matter of Zaiden P. (Ashley Q.) (2022 NY Slip Op 07268)

Matter of Zaiden P. (Ashley Q.)

2022 NY Slip Op 07268

Decided on December 22, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 22, 2022

531324 532686 532687 532833
[*1]In the Matter of Zaiden P. and Another, Neglected Children. Cortland County Department of Social Services, Respondent; Ashley Q., Appellant. (Proceeding No. 1.)
In the Matter of Zaiden P. and Another, Alleged to be Permanently Neglected Children. Cortland County Department of Social Services, Respondent; Ashley Q., Appellant. (Proceeding No. 2.)
In the Matter of Zaiden P. and Another, Alleged to be Permanently Neglected Children. Cortland County Department of Social Services, Respondent; Bayshawn P., Appellant. (Proceeding No. 3.)

Calendar Date:November 14, 2022

Before:Garry, P.J., Clark, Aarons, Pritzker and McShan, JJ.

Rural Law Center of New York, Inc., Castleton (Keith F. Schockmel of counsel), for Ashley Q., appellant.
Lisa K. Miller, McGraw, for Bayshawn P., appellant.
Cortland County Department of Social Services, Cortland (Keith I. Cassidy of counsel), for respondent.
Mark A. Schaeber, Liverpool, attorney for the children.

Garry, P.J.
Appeals (1) from an order of the Family Court of Cortland County (Julie A. Campbell, J.), entered February 19, 2020, which, in proceeding No. 1 pursuant to Family Ct Act article 10, denied respondent's motion to modify a prior order temporarily suspending her visitation with the subject children, (2) from an order of said court, entered November 25, 2020, which granted petitioner's applications, in proceedings Nos. 2 and 3 pursuant to Social Services Law § 384-b, to adjudicate the subject children to be permanently neglected, and terminated respondents' parental rights, (3) from an order of said court, entered November 25, 2020, which dismissed respondent's amended cross application, in proceeding No. 2 pursuant to Social Services Law § 384-b, to terminate placement, and (4) from an order of said court, entered February 2, 2021, which granted petitioner's application, in proceeding No. 1 pursuant to Family Ct Act article 10, to permanently suspend respondent's visitation with the subject children.
Respondent Ashley Q. (hereinafter the mother) and respondent Bayshawn P. (hereinafter the father) are the parents of the subject children (born in 2017 and 2018). In June 2017, petitioner received a child protective report from the Statewide Central Register of Child Abuse and Maltreatment alleging that respondents were frequently involved with law enforcement for fighting and drug use. Petitioner's investigation of the report revealed, among other concerns, instances of domestic violence between respondents, an indicated child protective report against the father for inadequate guardianship of another child and a conviction for endangering the welfare of that child, substance abuse with respect to the father, untreated mental health issues on the part of both respondents and housing instability. In August 2017, petitioner filed a neglect application against each parent, and, pursuant to October 2017 orders entered on their default, respondents were found to have neglected the older child. Respondents were placed under petitioner's supervision and were required to undergo substance abuse, mental health and psychological evaluations and complete any recommended treatment, complete an anger management program and two parenting programs and maintain a safe and stable home, among other things.
In November 2017, petitioner filed a violation application against each parent, alleging that they had failed to abide by those conditions. The application against the father was granted upon default, and the application against the mother was granted upon consent, without admission of wrongdoing. The October 2017 dispositions were therefore revoked, and the older child was placed in petitioner's care and custody. The conditions imposed upon respondents were continued in full, and certain additional conditions were added, including the requirement that the mother seek medical attention for a serious untreated physical condition that reportedly causes, among other [*2]symptoms, aggression and impulsivity.
In May 2018, when the younger child was born, petitioner brought a derivative neglect proceeding against the mother citing the historic domestic violence between respondents, their continued relationship and the mother's failure to comply with the previously-ordered services. The younger child was removed from the mother's custody at the hospital following her birth and placed with a different foster family. In July 2018, the mother consented to a finding of neglect, without admission of wrongdoing, with respect to the younger child.[FN1]
In October 2018, upon the mother's request, the children were moved to Cattaraugus County and placed together with a family resource — the mother's former foster parent. A secondary local caseworker was assigned, but petitioner's motion to transfer the neglect proceedings to Cattaraugus County was ultimately denied. In May 2019, it was determined that the mother's former foster parent was presenting an obstacle to reunification, and the children were therefore moved to a new foster home, where they have remained.
In August 2019, following numerous incidents between the mother and caseworkers and service providers in both counties, petitioner commenced proceeding No. 1 seeking to suspend the mother's visitation with the children, and Family Court signed an order to show cause to that effect. Petitioner then commenced proceedings Nos. 2 and 3 to adjudicate the children permanently neglected and terminate respondents' parental rights. The mother answered and filed an amended cross application to terminate placement. During the pendency of the ensuing fact-finding hearing, the mother also moved to modify the order suspending her visitation. That motion was denied by order entered February 19, 2020. Following eight days of testimony, Family Court found that respondents permanently neglected the children, and, following a dispositional hearing, the court terminated respondents' parental rights by order entered November 25, 2020. In light of that order, the court entered a second order on that date dismissing the mother's cross application to terminate placement. Thereafter, by order entered February 2, 2021, the court granted petitioner's motion to suspend the mother's visitation. Respondents both appeal from the November 2020 order terminating their respective parental rights, and the mother also appeals from the February 2020 order, the November 2020 order denying her motion to terminate placement and the February 2021 order.[FN2]
The mother initially argues that the orders before us, and these proceedings generally, are nullities because she was not served with the initial neglect petition in accordance with the terms of an August 1, 2017 order to show cause directing that personal service on her be accomplished by August 3, 2017. In support of her claim, she points to a caseworker's affidavit submitted in support of the violation petitions, in which the caseworker articulates the [*3]history of these matters and states that respondents left Cortland County around the time that the neglect proceedings were commenced and that, on August 29, 2017, petitioner located respondents in New Jersey and had them served there. The mother asserts that, because there is nothing in the record before us to indicate that substitute service was authorized and accomplished, we must conclude that Family Court never obtained personal jurisdiction over her (see generally Matter of Sorli v Coveney, 51 NY2d 713, 714 [1980]; Matter of Keith X. v Kristin Y., 124 AD3d 1056, 1057-1058 [3d Dept 2015], lv denied 25 NY3d 907 [2015]). Her argument follows that, without jurisdiction, the October 2017 default order as to her, and the January 2018 order finding a violation thereof, are nullities; the May 2018 order finding derivative neglect upon consent is therefore also a nullity, and, "[f]or like reasons," the November 2020 order finding the children to be permanently neglected is also null.
Even if we were to accept the mother's line of reasoning, and thus agree that a service issue in a proceeding not before us may be reviewed upon these appeals, the silence in the record on appeal as to this issue — which was not litigated in the instant proceedings — cannot be said to be dispositive.[FN3] Moreover, the findings in the October 2017 and January 2018 orders, and the mother's noncompliance with those orders, were not the sole bases of the permanent neglect proceeding against her, and it is not disputed that Family Court obtained personal jurisdiction over the mother for that purpose. We therefore find the mother's nullity argument unavailing.
As relevant here, a permanently neglected child is one who is in the care of an authorized agency and whose parent has failed, for at least one year after the child came into the agency's care, to "substantially and continuously or repeatedly . . . plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship" (Social Services Law § 384-b [7] [a]). Thus, as a threshold matter, the petitioning agency must prove, by clear and convincing evidence, that it had made "practical and reasonable efforts to ameliorate the problems preventing reunification and strengthen the family relationship by such means as assisting the parent with visitation, providing information on the child's progress and development, and offering counseling and other appropriate educational and therapeutic programs and services" (Matter of Makayla I. [Sheena K.], 201 AD3d 1145, 1147 [3d Dept 2022] [internal quotation marks and citation omitted], lvs denied 38 NY3d 903 [2022]; see Social Services Law § 384-b [7] [f]; Matter of Sheila G., 61 NY2d 368, 385-386 [1984]).
With respect to the assistance provided to the mother, the record establishes that petitioner's caseworker first promptly addressed the issue of housing instability, placing [*4]the mother in emergency housing and then referring her to a domestic violence organization for a spot at a safe house and enrollment in its educational program. The mother was asked to leave the safe house and program shortly thereafter for violating certain rules, which included her permitting the father to visit the safe house. The mother then obtained the assistance of a third-party organization to secure other transitional housing prior to being approved for temporary housing assistance. Petitioner's caseworker also provided the mother with referrals for mental health and substance abuse evaluations and anger management. The mother was also eventually referred for a psychological evaluation, albeit following some delay in obtaining an adequate social history from her.
Petitioner's caseworker personally supervised in-home visits with the mother and later arranged for supervised visits to take place at the Elmcrest Family Support Program, through which she was provided with weekly social work support and parenting classes. Following a June 2018 incident where the mother was unable to control her frustration with service providers, the mother was issued a no-trespass order for the Elmcrest premises. Petitioner's caseworker then made additional efforts to facilitate the mother's visitation off site. The caseworker later aided the mother in having the children moved to Cattaraugus County and provided the mother with transportation for her own move. Once in Cattaraugus County, the mother received regular visits, supervised by the mother's former foster mother. When the children were removed from that placement, the secondary local caseworker facilitated and supervised visits. In May 2019, the mother, again frustrated with her circumstances, repeatedly threatened the secondary caseworker, which led to the mother's conviction for obstruction of governmental administration and a stay away order in favor of the caseworker. As a result, Cattaraugus County would no longer agree to provide courtesy casework services for either the mother or the father. Petitioner's caseworker again made efforts to facilitate the mother's visitation, providing a referral to another private facility. In August 2019, the mother's inability to control her anger towards service providers led to that provider also refusing to facilitate further visitation for her.
With respect to the father, petitioner's caseworker similarly provided emergency housing once the father made contact with petitioner at the end of December 2017.[FN4] It appears that he instead primarily resided with the mother thereafter while he awaited review of his temporary assistance application. By the time he was in Cattaraugus County, the father had obtained housing via temporary assistance. This was in part due to the secondary caseworker, who drove the father to meet potential landlords. The secondary caseworker also aided him in recertifying his eligibility for temporary assistance; for reasons unknown to [*5]her, the father ultimately lost that benefit. The father was also provided referrals for psychiatric and substance abuse evaluations and an anger management program. He was provided social work support, parenting classes and visitation through Elmcrest, although scheduling was made difficult by the father's failure to provide reliable contact information. Petitioner's caseworker attempted to remedy this obstacle by providing the father with a cell phone and phone cards on several occasions. The father was again incarcerated for some period from August 2018 through October 2018, and petitioner's caseworker met with him in jail for the purpose of facilitating continued visitation — a service that the father declined. After his release, the father was afforded opportunities for supervised visitation in Cattaraugus County, although the mother's actions did eventually complicate the father's access to visitation.
When respondents chose to attend service plan reviews and family support sessions, petitioner's caseworker and other service providers addressed with them the reasons for the children's removal and placement in foster care, the service plan and respondents' level of engagement with services. In view of the foregoing, we find ample support in the record that petitioner made the requisite diligent efforts to encourage and strengthen respondents' relationships with the children (see Matter of Jase M. [Holly N.], 190 AD3d 1238, 1240-1241 [3d Dept 2021], lvs denied 37 NY3d 901 [2021]; Matter of Brielle UU. [Brandon UU.], 167 AD3d 1169, 1172-1173 [3d Dept 2018]; Matter of Timothy GG. [Meriah GG.], 163 AD3d 1065, 1071 [3d Dept 2018], lvs denied 32 NY3d 908 [2018]; Matter of Alexander Z. [Jimmy Z.], 149 AD3d 1177, 1178-1179 [3d Dept 2017]).
In determining whether respondents planned for the future of their children, the relevant inquiry is whether they took "such steps as [were] necessary to provide an adequate, stable home and parental care for the child[ren] within a period of time which [was] reasonable," mindful that "good faith effort [is] not, of itself, . . . determinative" (Social Services Law § 384-b [7] [c]; see Matter of Star Leslie W., 63 NY2d 136, 143 [1984]). "[T]he court may consider [respondents'] failure . . . to utilize medical, psychiatric, psychological and other social and rehabilitative services and material resources made available" (Social Services Law § 384-b [7] [c]; see Matter of Jamie M., 63 NY2d 388, 393 [1984]).
At first, the mother resisted participating in services and refused to execute required releases. She was unsuccessfully discharged from her initial attempts at certain programs for either her lack of attendance or her disruptive attitude. However, she eventually satisfied many of the conditions imposed upon her, which she attributed to her relocation to Cattaraugus County and the increased support that she had there. She obtained safe and stable housing, completed a domestic violence program and more than the [*6]required number of parenting classes and was pursing mental health counseling, anger management treatment and appropriate medical services on a somewhat consistent basis. She also resumed psychiatric medications that she had taken before her pregnancies. That said, every witness who had the opportunity to observe the mother outside of a therapeutic setting testified that the mother had not benefitted from the services she engaged in. Even after her relocation, the mother continued to be combative and hostile with her caseworkers and the service providers who were trying to support her and her children — actions that resulted in restraining orders and a criminal conviction. Although she regularly attended, was prepared for and had largely positive interactions with the children at visits, she repeatedly thwarted her ability to see the children by failing to place their needs above her resentment of petitioner and providers. She also continued to prioritize her tumultuous relationship with the father over regaining custody. In light of the foregoing, we find that petitioner proved by clear and convincing evidence that the mother failed to plan for the children's future, and Family Court's finding of permanent neglect as to her therefore will not be disturbed (see Matter of Makayla I. [Sheena K.], 201 AD3d at 1148-1149; Matter of Jase M. [Holly N.], 190 AD3d at 1242; Matter of Paige J. [Jeffrey K.], 155 AD3d 1470, 1474 [3d Dept 2017]; Matter of Jessica U. [Stephanie U.], 152 AD3d 1001, 1004 [3d Dept 2017]).
The father failed to maintain consistent housing during the course of these proceedings. He also repeatedly failed to abide by the condition that he lead a law-abiding life; not only was he repeatedly incarcerated for theft-related crimes, the father also physically assaulted the mother in August 2018, and he repeatedly violated the order of protection that was issued as a result and was ultimately arrested for one such violation. The father did complete a substance abuse evaluation, and no recommendation for treatment was issued. It was, however, recommended that he engage in counseling following his mental health evaluation, and he made minimal effort to that end before determining for himself that he did not require therapy. He also failed to engage in an anger management program and completed only one parenting class. In terms of visitation, there were several stretches of time where the father, having missed scheduled visits, then took little initiative to see the children, an issue that was compounded by his failure to keep petitioner abreast of his multiple changes in address and contact information. We find the foregoing evidence to be clear and convincing proof that the father failed to plan for the children's future, although able to do so, and Family Court's finding of permanent neglect as to him likewise will not be disturbed (see Matter of Jason O. [Stephanie O.], 188 AD3d 1463, 1466-1467 [3d Dept 2020], lv denied 36 NY3d 908 [2021]; [*7]Matter of Logan C. [John C.], 169 AD3d 1240, 1244 [3d Dept 2019]; Matter of Brielle UU. [Brandon UU.], 167 AD3d at 1172-1173; Matter of Alexander Z. [Jimmy Z.], 149 AD3d at 1180).[FN5]
The father further challenges Family Court's determination to terminate his parental rights, as opposed to granting a suspended judgment. "Following an adjudication of permanent neglect, the sole concern at a dispositional hearing is the best interests of the child[,] and there is no presumption that any particular disposition, including the return of a child to a parent, promotes such interests" (Matter of Jason O. [Stephanie O.], 188 AD3d at 1467 [internal quotation marks and citations omitted]; see Family Ct Act § 631; Matter of Michael B., 80 NY2d 299, 311 [1992]). The evidence presented at the dispositional hearing demonstrated that the children have been in foster care for essentially their entire lives. Both children had been with their current foster family for well over a year by the time of the dispositional hearing and were healthy and happy in that placement. It was also established that the foster parents are an adoptive resource. Although, in the early stages of these proceedings, the older child would show interest in the father during visits, this waned over time, and, by the time of the dispositional hearing, visits with the father caused both children serious emotional distress. Considering the record in its entirety, and according deference to Family Court's factual findings and choice among dispositional alternatives, we discern no basis to disturb the conclusion that termination of the father's parental rights served the best interests of the children (see Matter of Makayla I. [Sheena K.], 201 AD3d at 1152; Matter of Jason O. [Stephanie O.], 188 AD3d at 1468; Matter of Keadden W. [Hope Y.], 165 AD3d 1506, 1509 [3d Dept 2018], lv denied 32 NY3d 914 [2019]). We note that the attorney for the children continues to support this disposition.[FN6]
Clark, Aarons, Pritzker and McShan, JJ., concur.
ORDERED that the appeal from the order entered February 19, 2020 is dismissed, without costs.
ORDERED that the order entered November 25, 2020, adjudicating the subject children to be permanently neglected and terminating respondents' parental rights, is affirmed, without costs.
ORDERED that the appeals from the orders entered November 25, 2020, dismissing respondent Ashley Q.'s amended cross application to terminate placement, and February 2, 2021 are dismissed, as moot, without costs.

Footnotes

Footnote 1: The father was regarded as the putative father for this proceeding.

Footnote 2: The mother's appeal from the nondispositional February 2020 order must be dismissed (see Family Ct Act § 1112 [a]; Matter of Andzel-Graziano v Graziano, 193 AD3d 1282, 1283 [3d Dept 2021]).

Footnote 3: To the extent that the mother also claims that there is no proof in the record that she was properly served with the August 23, 2019 order to show cause suspending her visitation, we similarly reject her claim.

Footnote 4: The father appears to have been incarcerated for certain larceny charges following the older child's removal.

Footnote 5: Although we agree with the father that the June and July 2018 Elmcrest assessments offered by petitioner at the fact-finding hearing contained hearsay not subject to the business records exception (see CPLR 4518 [a]; Matter of Leon RR., 48 NY2d 117, 122-123 [1979]), we find the error in their wholesale admission to be harmless given that there is no indication that Family Court relied upon this evidence and in light of the other evidence in admissible form that amply supports Family Court's determination (see Matter of Carmela H. [Danielle F.], 185 AD3d 1460, 1461 [4th Dept 2020], lv denied 35 NY3d 915 [2020]; Matter of Melisha M.H. [Sheila B.R.], 119 AD3d 788, 789 [2d Dept 2014]; Matter of Nicholas R. [Jason S.], 82 AD3d 1526, 1528 n [3d Dept 2011], lvs denied 17 NY3d 706 [2011]; Matter of Keith JJ., 295 AD2d 644, 647 n [3d Dept 2002]).

Footnote 6: In light of our conclusion, the mother's appeals from the order dismissing her cross application and the order granting petitioner's motion to suspend her visitation are moot and must also be dismissed (see Matter of Isaac YY. [Arielle YY.], 200 AD3d 1506, 1507 n 1 [3d Dept 2021]; Matter of Robert B. [Paula C.—Tinker A.], 180 AD3d 1250, 1252 [3d Dept 2020], lvs denied 35 NY3d 911 [2020]).